# Selligman et al., Board of Adjustments and Appeals, v. Western & Southern Life Ins. Co.

Dec. 16, 1938.

As Modified on Denial of Rehearing March 24, 1939.

Eugene Hubbard, Judge.

LAWRENCE S. POSTON and HAL O. WILLIAMS for appellants.
J. VERSER CONNER for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

Sections 3037h-111 to 3037h-137, Kentucky Statutes, create in the City of Louisville a City Planning and Zoning Commission and provide that the legislative body thereof is empowered to regulate and restrict the height, number of stories and size of buildings and

other structures and the location and use of buildings for trade, industry, residence or other purposes.

Pursuant to authority derived from the above mentioned statutes, the Board of Aldermen of the City of Louisville in 1931 enacted an ordinance designed to promote the objects and purposes contained in these statutes and the question presented for decision in the present case arises under section 5 of the zoning ordinance of the city, found on page 1245 of the compilation of 1935. This section establishes use regulations in the "C" and "D" apartment district and by its provisions no building may be erected in this district or structurally altered except for the purposes named in subsections 1 to 6 of this section. It is conceded by both sides in the present case that the controversy falls under section 5, subsection 5, which reads as follows:

"(5) Accessory buildings and uses customarily incident to any of the above uses when located on the same lot and not involving the conduct of a business, including private and storage garages when located not less than sixty (60) feet from the front lot line nor less than five (5) feet from any other street line or a private or storage garage constructed as a part of the main building."

The property involved in this litigation is known as the Puritan Apartments and is located on the west side of Fourth Street in block 679, which is bounded by Oak Street on the north and Ormsby Avenue on the south. At a point about 200 feet south of Oak Street is a 20-foot alley running westwardly from Fourth Street to a street known as Garvin Place. The Puritan Apartments lie between the alley mentioned and Ormsby Avenue to the south and is designated as a "D" apartment district, whereas the property on Fourth Street between the alley and Oak Street to the north is in a less restricted district. The "D" apartment district is highly restricted by the terms of the zoning ordinance.

The original Puritan Apartments consisted of a building in one unit located on lot 17 of block 679 and subsequently another unit was constructed on lot 18 adjoining, both lots having an aggregate frontage of 245 feet on the west side of Fourth Street running back westwardly 200 feet to a 20-foot alley. Appellee, Western and Southern Life Insurance Company, acquired title to this property in December, 1932.

In November, 1936, appellee decided to erect a storage garage and applied to the building inspector of the city for a permit to erect it on the Embry lot, which was a lot 85 by 200 feet immediately north of and adjoining appellee's property. The building inspector denied this application on the ground that such proposed garage constituted a violation of the zoning ordinance. His ruling was appealed to the Board of Adjustment and Appeals, a board created by the statute and zoning ordinance, and a variation from the zoning ordinance applied for. The Board, on December 9, 1936, denied the application for variation, principally because of its objection to an entrance to the proposed garage from Fourth Street.

When the application for variation was denied by the Board, members of the Board suggested to Walter F. Jacobs, who represented appellee in all matters concerned in this litigation, that if he would submit a sketch of the proposed garage, eliminating the Fourth Street entrance and providing for an entrance from the 20-foot alley to the west of the property and coordinating the architecture of the front of the garage with that of the apartment building, the Board might reconsider the matter.

Pursuant to this suggestion, on or about December 16, 1936, appellee applied again to the building inspector for a permit to build the garage for storage only. The building inspector again denied the permit and appellee appealed to the Board of Adjustment and Appeals and applied for a variation. The matter was heard before the Board on December 23, 1936, and Jacobs at that time presented to the Board a plan or sketch showing no entrance to the garage from Fourth Street and showing the requisite coordination of architecture.

We find from the evidence that it was thoroughly understood between the Board and Mr. Jacobs at that meeting that there would be no entrance to the proposed garage from Fourth Street; that the architecture of the front of the garage would be of the same general type as that of the main apartment building; and that the space between the front of the garage and the Fourth Street property line would be landscaped in the same manner as the rest of the property. A resolution of the Board on December 23, 1936, granted appellee's application for a variation and this resolution recites these

conditions, or restrictions, and concludes with this language: "Resolved, that the application be granted on condition the building be set back 10 feet from the present alley line."

In April, 1937, appellee acquired title to the Embry lot above mentioned and had plans and specifications for the garage prepared by an architect and contractor.

On February 5, 1938, without further consulting the Board, appellee presented these plans and specifications to the building inspector with his application for a permit to erect the proposed garage. These plans and specifications differed materially from the type of structure contemplated by the resolution of the Board of December 23, particularly in that they provided for a Fourth Street entrance into the garage and that the architecture did not conform to the type of architecture of the main building.

The building inspector issued the permit and appellee started work on February 7, 1938, but on March 3, 1938, the building inspector stopped the work by order of the Board and appellee was instructed to appear before the Board.

On March 11, 1938, appellee appealed to the Board from the stop order issued by the building inspector and on March 21, 1938, the Board upheld the stop order, denied the appeal and upheld the decision of the building inspector. It also reaffirmed its finding of December 23, 1936, and required revised plans to be submitted for the approval of the Board before building permit was issued.

From this order of the Board appellee prosecuted an appeal to the Jefferson Circuit Court. That court found that the proposed garage was not a non-conforming structure and further adjudged that the building permit issued by the building inspector on February 5, 1938, was in full force and effect and that appellee was authorized to complete the erection of the garage pursuant to the permit. From that judgment the present appeal is prosecuted.

The main question necessarily presented for decision is whether or not the proposed garage is a nonconforming structure under subsection 5 of section 5 of the ordinance as quoted above. The evidence shows this to be a private or storage garage for the use of the

tenants of the Puritan Apartments, which leaves for determination a very narrow question, namely, is it "a storage garage constructed as a part of the main building"? If the proposed garage cannot be said to be "constructed as a part of the main building," it is a non-conforming structure and therefore within the prohibition of the zoning ordinance.

The plans and specifications filed show that the north wall of the Puritan Apartments building, which runs back from Fourth Street at right angles, will, for a distance of approximately 30 feet, be the south wall of the proposed garage; that a door will be cut in this wall, making an entrance between the Puritan and the garage; that the roof of the garage will be tied into this north wall, the purpose of this being of course to effect a water-tight union; and that some of the steam and water pipes will be brought through this wall into the garage. Except for this distance of 30 feet, the garage would in no wise be connected with or in contact with the apartment building, as there is an open court between the apartment building and the garage beginning at the end of this 30-foot contact between the two buildings. Appellee argues most earnestly that the proposed garage when completed would be "constructed as a part of the main building." Appellant insists as earnestly that this could not be true.

We have come to the conclusion that if this building were completed as planned it could not be said to be a garage constructed as a part of the main building, that it could only be said to be attached to the main building. We are firmly of the opinion that the language in the zoning ordinance has a far broader meaning than appellee would have ascribed to it. It seems to us that to give it the meaning contended for by appellee would almost completely disrupt and set aside subsection 5 of section 5 quoted above.

Some of the considerations entering into our conclusion that the garage, after completion, could not be said to be constructed as a part of the main building are: That the apartment building could be torn down, leaving the garage standing; that the garage could be removed by slight disturbance of the wall to which it was attached, so that there could easily be a complete severance between the garage and the apartment building proper; that the proposed garage is in no sense

structurally dependent on the apartment building and is not actually an integral part thereof; that it would not be under the same roof nor contained within the walls of the original building; that it does not conform architecturally to the apartment building; that it would be built on a separate lot (adjoining the lot of the main building, it is true) acquired for this purpose long after construction of the original building.

We have determined to make no attempt to lay down an all-inclusive definition as to the meaning of the words "constructed as a part of the main building," as we feel that to do so might be inviting trouble in the future, but we content ourselves with stating the definite conclusion reached that, under the proof introduced in this case, the proposed structure when completed could not be said to be one "constructed as a part of the main building."

A number of the witnesses in this case expressed opinions pro and con as to whether or not the proposed garage, if constructed, could be said to be "constructed as a part of the main building," but, after all, this is a question for the court to detemine in view of the facts proven in the case. It appears that this subsection of the zoning ordinance is in the form adopted by many cities, but counsel are unable to cite any case from this or any other jurisdiction construing this language, although counsel on both sides have been very diligent in presenting their arguments and in placing before the court every authority which they conceive might have any bearing on this question. However, as none of these authorities really bear upon the narrow question presented here, we do not find them of much help in solving the problem.

Appellee insists that to give this language the construction we have given it would result in making illegal nearly all private residential garages constructed in recent years, its argument being that such garages are as a rule one-story affairs, most often attached to the side of the residence and with an entrance to the residence. We do not, however, regard our conclusion as entailing any serious consequences along this line, for we would have little hesitation in saying that a purely private residential garage constructed at the same time as the residence would be classified as one constructed as a part of the main building, although it

might not be structurally dependent thereon and not under the same roof as the actual residential portion. We must also keep in mind that it is not to be presumed that the Board of Adjustment and Appeals would act arbitrarily and unreasonably with reference to the construction of private garages of this type, and even if such a garage is to be constructed after the construction of a residence, and though it might be a non-conforming structure, yet it must be remembered that if application of the letter of the law would work undue hardship the Board is authorized and empowered to grant a variation. The presumption is that the Board would act fairly and reasonably, not arbitrarily.

It is also argued that as the Board concedes the appellee might build a separate apartment building with a garage in the basement or on the first floor, it leads to an absurdity to deny it the privilege of building the proposed structure, the argument being that appellee, by building apartment rooms over the proposed garage, might thereby bring the proposed structure within the phraseology "constructed as a part of the main building." However, we take it that even under the zoning ordinances the rule of reason would apply and that a court might inquire to some extent into the question of good faith on the part of one proposing to erect a building of this type. We also take it that there is little likelihood of anyone attempting to construct an architectural monstrosity in a highly restricted zone such as this and on property as expensive as this is shown to be. But, as we have indicated above, we deem it best not to attempt to lay down any hard and fast rules which might bring about confusion in the future, but to let each situation as it arises under the zoning laws take care of itself.

We are firmly of the opinion, therefore, that the proposed garage is a non-conforming structure within the meaning of subsection 5 and that, therefore, appellee may not proceed with its construction unless some other principle of law or some conduct of the city authorities has divested the Board of the right to interfere with this construction.

Appellee contends that it was the duty of the Board to permit a variation from the zoning ordinance in this particular case because to enforce it literally would result in unwarranted hardship and injuries. The Board

evidently agreed with appellee in this contention and it did grant a variation from the zoning ordinance as evidenced by the resolution of December 23, 1936, granting the variation but prescribing certain conditions and restrictions.

With reference to whether or not the Board should grant a variation in any particular case, our opinion is that this is a matter addressed to the sound discretion of the Board and the discretion used by it will not be set aside lightly by the court, but only when it is apparent that the Board has acted arbitrarily or unreasonably. We are not prepared to say that it did so in this case. The statute creating this Board prescribes high qualifications as a prerequisite to membership thereon, and no presumption is to be indulged that a board composed of men of this type has acted arbitrarily or unreasonably. The evidence in the case, and we presume the Board had proper evidence before it on the application, makes it apparent that this was peculiarly a matter to be determined by the Board, who are naturally presumed to be well-acquainted with traffic conditions in the city.

Appellee contends, however, that even if the Board had power to prohibit the construction entirely because of non-conformity with the zoning ordinance, it could not use that power to require compliance with conditions which initially it had no right to impose. We do not think this contention of appellee is sound. An application for a variation from a zoning ordinance is a request that the ordinance be departed from on account of peculiar conditions and on account of hardship which might be entailed by reason of adhering to the letter of the law. As, in granting a variation, the Board is departing from the letter of the law, we do not feel that it is reasonable to say that it may only depart from the letter of the law in favor of the applicant. It seems to us that in departing from the strict letter of the law the Board, as a condition to granting such a variation, may also impose reasonable restrictions which are not contained in the zoning ordinance and which originally it did not have power to impose, the only qualification being that if any unreasonable conditions or restrictions are imposed as the price of this variation on the part of the Board, the courts may set aside such unreasonable or arbitrary restrictions or conditions. This seems to be the rule announced by inference in the case

of Soho Park & Land Co. v. Board of Adjustment of Town of Belleville, 142 A. 548, 6 N. J. Misc. 686, 1928.

We recognize the correctness of the principle generally that there must be a "yardstick rule" in zoning ordinances and that no discretion is vested in a board of this type or in a city council in granting building permits. City of Monticello v. Bates, 169 Ky. 258, 183 S. W. 555; Board of Trustees of Town of Bloomfield et al. v. Bayne, 206 Ky. 68, 266 S. W. 885. However, we think the reason behind the rule announced in those cases ceases to operate in the situation presented here where the Board is expressly authorized by statute to depart from the "yardstick rule" and exercise its discretion. It seems to us the better reasoning is that when this departure from the "yardstick rule" is made by the Board, the departure does not necessarily have to be all in favor of the applicant but that the Board may then impose as a condition of the variation such reasonable conditions and restrictions as seem to it proper under the circumstances. That appears to be what was done by the Board by the resolution of December 23, 1936.

There is a paucity of authority on this proposition. The only direct decision we have been able to find dealing with the matter is in the matter of Appeal of Consolidated Cleaning Shops, 103 Pa. Super. 66, 157 A. 811, in which the Superior Court of Pennsylvania upheld the action of a board in imposing a condition when a variation was granted, the court saying that the granting of a variation is largely a matter of grace. In the case of Smith v. Zoning Board of Review of City of Pawtucket, 170 A. 75, the Supreme Court of Rhode Island, while not deciding this point directly, seems to recognize by inference the principle that a condition may be attached by the board when a variation is granted.

Some of the reasons and practical considerations emphasizing the wisdom of the conclusion we have reached in this question are stated in The Law of Zoning by Metzenbaum, p. 267, as follows:

"It has become a rather common practice for boards of appeals to allow a variance, subject to limitations imposed upon the permission itself. The power to attach such conditions, should be upheld unless the conditions are beyond the authority of the board or unless they are unreasonable, because in the absence of such 'conditions,' the applicant

might use a favorable ruling in such a way as to work an injury to the public and particularly to the neighboring area. Then too, if a board is not permitted to stipulate conditions upon which it will allow an appeal, it may plainly result in a refusal on the part of the board to grant a variance which it would otherwise have granted if permitted to tack a condition upon its favorable ruling, and in this way the applicant might well be denied any relief at all, whereas otherwise the board might feel justified in making a variance upon an appropriate conditional basis.''

Appellee contends, however, that it was misled by the notice of December 28, 1936, advising it that the Board had granted its application for a variation, this contention being based on the fact that at the bottom of the notice appeared these words: ''on condition the building be so constructed in the rear as to be 10 feet off the present alley line,'' and that no other conditions were contained in the notice. We do not find much merit in this contention of appellee because, as indicated above, we find from the evidence that Mr. Jacobs, to whom this notice was addressed, was fully cognizant of all the conditions imposed by the Board at the meeting of December 23 as evidenced by its resolution of that date. In accordance with the suggestion of the Board, after his previous application for a variation had been denied, he submitted to the Board the sketch or plan showing no entrance from Fourth Street and showing architecture conforming generally to the type of architecture of the Puritan Apartments. We have little doubt from the evidence in this case that Mr. Jacobs well knew that the Board, as a condition for granting this variation, was also imposing the conditions contained in the resolution. Even though we had doubts about this proposition, we would still say that appellee was bound to take notice of the resolution because the notice mailed to Mr. Jacobs used this language: ''The resolution of the Board is subject to your inspection at the office of the Board of Adjustment and Appeals.'' We do not feel that Mr. Jacobs was warranted in blindly going ahead and assuming that the only condition attached was the one mentioned in the notice that the building was to be constructed so as to be 10 feet from the alley line. Our conclusions on this matter are that Mr. Jacobs knew the conditions, but that

even if he did not, he was chargeable with notice of the conditions contained in the resolution and that he was in no sense misled by the notice. He could not ignore the resolution to which his attention was called by the notice and rely on his ignorance of its contents.

Appellee insists, however, that the permit for this building issued by the building inspector could not lawfully be revoked because large sums were spent in reliance on it. There seems to be considerable conflict of authority as to whether or not a permit issued by a building inspector and acted on by the permittee may be revoked. A number of cases cited by appellee are to the effect that where a permittee has made substantial expenditures after the permit is issued it cannot be revoked. Freeman v. Hague, 106 N. J. L. 137, 147 A. 553; Wickstrom v. City of Laramie, 37 Wyo. 389, 262 P. 22; Rehmann v. Des Moines, 200 Iowa 286, 204 N. W. 267, 40 A. L. R. 922; Dainese v. Board of Public Works of D. C., 91 U. S. 580, 23 L. Ed. 251. A contrary rule is announced in cases cited by the appellant, Bianchi v. Commissioner, 279 Mass. 136, 181 N. E. 120; Wood v. Building Commissioner of City of Boston, 256 Mass. 238, 152 N. E. 63; Rollins v. Armstrong, 251 N. Y. 349, 167 N. E. 466; Colonial Beacon Oil Company v. Finn, 270 N. Y. 591, 1 N. E. (2d) 345; Ostrowsky v. City of Newark, 102 N. J. Eq. 169, 139 A. 911.

In the case of O'Bryan v. Highland Apartment Company, 128 Ky. 282, 108 S. W. 257, 33 Ky. Law. Rep. 349, 15 L. R. A., N. S., 419, this court held that a building permit issued by a building inspector could be revoked even after work started on the building and in the opinion this laguage is used [page 260]:

"The contention of appellants that the permit to build, having once been issued, cannot be revoked, is not well taken. It is evident from the facts in this case that at the time the permit was issued either the building inspector was not thoroughly familiar with his duties in the premises, or else he issued the permit under a misstatement or misconception of the facts. I am inclined to the opinion that the latter is the correct theory, for, as soon as he was notified that the proposed building was within 60 feet of a permanent structure, and therefore came within the inhibition of section 65, above quoted, he at once notified appellants to discontinue the work until an investigation could be made. Therefore the

permit was issued without right or authority in law, and was in direct conflict with and a violation of the plain provision of the law, as set out in section 65, and, being so issued, if appellants procured the permit without giving to the building inspector a full exhibit of the facts, they cannot now complain because it is withdrawn or revoked. * * * I am of opinion that, if the building inspector himself on his own initiative had canceled this permit, appellants could not complain; for if he had a discretion in the matter, which he could exercise in granting the permit if he had exercised this discretion upon a mistake of fact, upon discovering that he had done so, he would clearly have a right to revoke the permit."

We are not prepared to say that no situation might arise in which the city authorities would be not estopped from revoking a permit where it had been issued and work done pursuant thereto. We refrain from deciding this general question, but we are of the opinion that under the circumstances shown in this case there is no estoppel against the Board or the building inspector from revoking this permit and that appelllee obtained no vested right thereby.

Mr. Jacobs admits that after the board meeting of December 23, 1936, at which meeting, as we have indicated, there was a thorough understanding between him and the Board as to the type and manner of construction of the garage, in February or March following he came to the conclusion that the garage must have an entrance on Fourth Street on account of the traffic congestion which would be brought about by having the entrance from the rear alley. While Mr. Jacobs does not so admit, we are inclined to the view that after he consulted counsel about that time (not counsel in the present case) he was of the opinion that the proposed garage was not a non-conforming structure and that he could go ahead in disregard of his understanding with the Board and the restrictions imposed by it in granting the variation. Although he had led the Board to believe there would be no entrance on Fourth Street and although the building inspector had denied a permit for the garage because it was a non-conforming structure, the plans as actually submitted to the building inspector called for an entirely different proposition from that assented to by the Board in the December 23 resolution.

The building inspector, of course, knew of the proceedings before the Board and when the application for this permit was made by Mr. Jacobs he stated to the building inspector that the matter had been taken up with the City Zoning and Planning Commission. Under the circumstances shown in this case, we feel that Mr. Jacobs was at least partially responsible for the issue of this permit by the building inspector under a misapprehension of fact. We do not say that the permit was secured by fraud on Mr. Jacobs' part, but we do feel that the circumstances of this case called on him to make a more complete disclosure to the building inspector and that the permit was issued under a misapprehension of fact for which Mr. Jacobs was largely responsible. In view of the evidence in this case, we are of the opinion that the building inspector was justified in his action in stopping the work.

It is insisted by appellee that the construction given by us to the ordinance in controversy results in depriving it of its property without due process of law and denies to it the equal protection of the laws in violation of the rights guaranteed by the Fourteenth Amendment to the Constitution of the United States, U. S. C. A. We are of the opinion, however, that there is no merit in this contention, as it appears to us that the provisions of the ordinance in question are reasonable and not arbitrary.

In view of our conclusions (1) that the proposed garage is a non-conforming structure, (2) that appellee was not misled by the notice above mentioned or any other action upon the part of the Board, and (3) that under the circumstances of this case the building inspector rightly revoked the permit issued to appellee, it follows that the judgment of the lower court must be and is hereby reversed with directions for further proceedings in conformity with this opinion.

The whole court sitting, except Stites, C. J.